IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 15-00326 LEK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SAMANTHA LEIALOHA WATANABE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S APPEAL, REVERSING JUDGMENT IN A CRIMINAL CASE
AND REMANDING CASE TO THE MAGISTRATE JUDGE FOR A NEW TRIAL**

Before the Court is Defendant Samantha Leialoha
Watanabe's ("Defendant") appeal from the magistrate judge's
Judgment in a Criminal Case ("Judgment"), entered pursuant to the
jury's guilty verdict ("Appeal"). [Judgment, filed 5/3/15 (dkt.
no. 189); Notice of Appeal, filed 5/4/16 (dkt. no. 192).]
Defendant filed her Opening Brief in Support of Appeal from
Magistrate Judge's Judgment of Conviction and Sentence ("Opening
Brief") under seal on September 19, 2016. [Dkt. no. 214.]
Plaintiff the United States of America ("the Government") filed
its Answering Brief on November 21, 2016, and Defendant filed her
Reply Brief in Support of Appeal from Magistrate Judge's Judgment
of Conviction and Sentence ("Reply Brief") under seal on
November 30, 2016. [Dkt. nos. 216, 217.] Defendant's Appeal
came before this Court for oral argument on December 19, 2016.

On January 20, 2017, this Court issued an entering order ruling on the Appeal ("1/20/17 EO Ruling"). [Dkt. no. 219.] The instant Order supersedes the 1/20/17 EO Ruling. After careful consideration of the briefs, the record, and the arguments of counsel, Defendant's Appeal is HEREBY GRANTED IN PART AND DENIED IN PART. Specifically, this Court GRANTS the Appeal insofar as this Court CONCLUDES that: the magistrate judge abused his discretion by allowing the Government to present lay opinion testimony regarding whether Defendant's actions toward her daughter were within the authority of parental discipline; and the error was not harmless. This Court DENIES the Appeal in all other respects. In light of this Court's rulings on the lay opinion testimony issue, this Court HEREBY REVERSES the Judgment and REMANDS the case to the magistrate judge for a new trial.

## BACKGROUND

On May 20, 2015, the Government filed an Information charging Defendant with "being an individual on an aircraft within the special aircraft jurisdiction of the United States" who "did intentionally and knowingly assault 'C.K.' born 01/29/2014, by striking her repeatedly," in violation of 49 U.S.C. § 46506 and 18 U.S.C. § 113(a)(5). [Dkt. no. 5.]

The magistrate judge held a jury trial on December 2, 3, 4, and 7, 2015. The jury began its deliberations on December 7, and returned a guilty verdict on December 8, 2015.

[Dkt. nos. 131, 134, 136, 137, 139 (Minutes); Verdict Form, filed 12/8/15 (dkt. no. 140).]  After ruling on post-trial motions and a sentencing motion, the magistrate judge sentenced Defendant to thirty days of imprisonment, one year of supervised release, and a $25.00 special assessment.  [Minutes of sentencing hearing, filed 5/3/16 (dkt. no. 188).]  The Judgment was entered on May 3, 2015, [dkt. no. 189,] and the instant Appeal followed.

The Appeal raises the following issues: 1) the magistrate judge's denial of Defendant's request to strike a potential juror – who was actually biased – for cause, which forced Defendant to use one of her peremptory challenges on the biased juror; 2) the magistrate judge's admission, over Defendant's objections, lay opinion testimony about whether the witnesses believed Defendant's actions toward C.K. were parental discipline; 3) the magistrate judge's admission, over Defendant's objections, testimony about an incident that occurred during boarding; 4) the Government improperly argued that the jury could base a conviction on acts that did not constitute striking and were not within the offense charged in the Information; and 5) even if none of these errors individually warrants vacating her conviction, the collective effect of these errors and other evidentiary rulings does.

The following events and testimony at trial are relevant to the issues on appeal.

## I.    Juror Bias

During jury selection, the Government asked the
potential jurors, "[d]o any of you have any beliefs about child
rearing or parenting or parental discipline that you think would
make it difficult for you to be a fair and impartial juror in a
case where the charges are assault against a child under the age
of 16 years?" [Jury Selection (12/2/15) Trans., filed 6/8/16
(dkt. no. 197) ("Jury Selection Trans."), at 34-35.]  The
potential juror who has been referred to as Juror Number 10 – a
preschool teacher – stated that she was "prebiased." [Id. at 35,
42.]  Specifically, she stated: "As a teacher, I am prebiased, as
it is part of my responsibility to monitor the well-being of my
students and other children in their home, as well as at school."
[Id. at 35.]  When asked to explain her use of the word
"prebiased," Juror Number 10 responded:

> It's just – it's hard to kind of turn off my
> personal and professional beliefs.  You know, as a
> teacher, it is my responsibility and – you know,
> to maintain the well-being of my students, the
> children.  So it's kind of hard to be outside of
> it, even outside of a school.

[Id.]  When the Government's counsel asked if her beliefs would
prevent her from being fair and impartial and from following the
judge's instructions and the law, she answered, "I would like to
say no, but it's kind of hard to tell."  [Id.]  The magistrate
judge then asked her if she would listen to all of the evidence

and keep an open mind, and if she would listen to the law as he gave it to her and follow the law. She responded "yes" to both questions. [Id. at 35-36.] When she was questioned by defense counsel, the following exchange occurred:

> MR. JEROME: So as part of your working at the preschool, are you required by law to report any suspected physical abuse that you might see?
>
> A PROSPECTIVE JUROR: Yes.
>
> MR. JEROME: Okay. And when you do that, what kind of standard do you use?
>
> A PROSPECTIVE JUROR: We have a procedure that the teachers are supposed to follow based – or given – provided by our school board, and then also abiding by the law.
>
> MR. JEROME: Okay. And if there is any doubt, what do you do in that kind of case?
>
> A PROSPECTIVE JUROR: It usually just – it still needs to be reported, and then it will go based on further, you know, discernment of like the director and higher.
>
> MR. JEROME: So if there is any doubt, you report it to the authorities and you let them take care of it.
>
> A PROSPECTIVE JUROR: Yes. No matter what, if there is just any suspicion, it's reported.
>
> MR. JEROME: Okay. And one of things you said to Mr. Wallenstein when he asked you if you could kind of put that aside and put your experience with that aside, and be fair in this case, I think what you said to him was that you would like to say you would be able to do that.
>
> A PROSPECTIVE JUROR: Yeah, I would like to say, but I can't –

MR. JEROME:  You can't say for sure.


A PROSPECTIVE JUROR:  Yeah, it would be really hard for me.

MR. JEROME:  Okay.  So even if the judge instructs you that that's the law, you still have some doubt in your mind about whether you would be able to do that.

A PROSPECTIVE JUROR:  Yes.

MR. JEROME:  Okay.  And that's just based on‐

A PROSPECTIVE JUROR:  Personal – my personal belief and, you know, the reason why I became a teacher.

MR. JEROME:  Okay.  So you kind of feel like maybe you're predisposed to believe that something happened versus something didn't happen.

A PROSPECTIVE JUROR:  Yes.

MR. JEROME:  Okay.  So it would be really hard for you to put your experiences aside.

A PROSPECTIVE JUROR:  Yes.

[Jury Selection Trans. at 42-44.]

Defendant challenged Juror Number 10 for cause, and the Government responded that the magistrate judge "sufficiently questioned [Juror Number 10] in the relevant area, and rehabilitated" her.  [Id. at 62-63.]  The magistrate judge overruled Defendant's objection to Juror Number 10.  In a sidebar, defense counsel further explained his reasons for wanting Juror Number 10 stricken for cause, and renewed the request.  Defense counsel also argued that, if the magistrate was

not inclined to excuse Juror Number 10 for cause, he should grant the defense a fourth peremptory challenge. The magistrate judge noted Defendant's objection to Juror Number 10 for the record, but denied both requests. Defense counsel then stated for the record that, if he had not been forced to use one of Defendant's three peremptory challenges on Juror Number 10, he would have used it on Juror Number 15. Ultimately, Juror Number 10 was excused, and Juror Number 15 remained on the jury. [Id. at 63-66.]

## II.  Lay Opinion Testimony

Defendant states that, over her objection, the magistrate judge allowed the Government to present testimony from at least five witnesses who opined that Defendant's conduct was not "parental discipline." Defendant contends that this was improper lay opinion testimony.

During Brian Miller's testimony, the following exchange occurred:

> THE WITNESS:  . . . And then [Defendant's] behavior was as I described it, it was kind of very nervous, very – you know, very excessive.
>
> MR. SILVERT:  Objection, Your Honor.
>
> THE COURT:  Overruled.
>
> BY MR. WALLENSTEIN:
> Q    Did the woman appear to you to be disciplining her child?
>
> A    No.

[Trial Day 1 (12/2/15) Trans., filed 6/8/16 (dkt. no. 198) ("12/2/15 Tr. Trans."), at 38.]

Cari Miller described Defendant's actions and stated that C.K. was not misbehaving.[1] [Trial Day 2 (12/3/15) Trans., filed 6/8/16 (dkt. no. 199) ("12/3/15 Tr. Trans."), at 79-86.] Cari Miller testified:

Q    Was what you saw parental discipline?

MR. SILVERT:  Objection.

THE COURT:  Overruled.

BY MR. WALLENSTEIN:
Q    You can answer the question.

A    I can answer?

Q    Um-hm.

A    No, it was not.

Q    Why not?

A    Because the child wasn't doing anything to be disciplined for.

Q    Any other reason why not?

A    It was very excessive.  It wasn't discipline.

Q    What do you mean by that?

A    It was abusive.

[Id. at 86-87.]

---

[1] Brian and Cari Miller are husband and wife, and Rebekah Miller is one of their children.  [12/2/15 Tr. Trans. at 37.]

One of the flight attendants, Arthur Moeller, testified:

> Q   Was that arm jerk that you saw parental discipline?
>
> A   I mean, I don't think that it's discipline that should happen, but yeah, she was very irritated.
>
> Q   I'll rephrase the question.  Was it justified parental discipline?
>
> MR. SILVERT:  Objection.
>
> THE COURT:  Overruled.
>
> BY MR. WALLENSTEIN:
> Q   You may answer.
>
> A   No.
>
> Q   Why not?
>
> A   Why isn't that right or –
>
> Q   Why is it not justified parental discipline, from what you saw?
>
> A   It was just too rough.  It was just too rough. . . .

[Id. at 65.]  Another flight attendant, Charise Pleitez, testified:

> Q   And based on your own personal observations of the woman, and not what you've heard about from other people, do you think she was just disciplining her child?
>
> A   No.
>
> MR. JEROME:  Objection, Your Honor.

THE COURT:  Overruled.

BY MR. WALLENSTEIN:
Q    Would you just repeat your answer, please?

A    No, I do not.

Q    Why is that?

A    It was – the little girl was doing nothing to deserve the kind of treatment she was receiving.

Q    Any other reason?

A    She was just being very harsh with her, like more than just normal discipline.

[Id. at 188.]  Another flight attendant, Susan Allen, testified:

Q    Can you describe the force of the slap?

A    Yes, it was unusually forceful, slap, very hard.

Q    Did it appear to be parental discipline?

A    No.

MR. JEROME:  Objection, Your Honor.

THE COURT:  Overruled.

BY MR. WALLENSTEIN:
Q    Why not?

A    Because you don't hit a baby.

[Id. at 201-02.]  Susan Allen later repeated that Defendant was not disciplining her child, because "[y]ou don't discipline a baby."  [Id. at 207.]

The Government attempted to elicit similar testimony from Rebekah Miller, but the magistrate judge sustained

Defendant's objection.  [Id. at 149.]

III. **Pre-Flight Incident**

As previously stated, the Information charged Defendant under the "special aircraft jurisdiction of the United States" with violating 49 U.S.C. § 46506 and 18 U.S.C. § 113(a)(5).  When the magistrate judge instructed the jurors on the elements of the charged offense, he instructed them that the conduct of conviction had to have occurred "after the moment all external doors were closed following boarding, but before the moment when one external door was opened to allow passengers to leave the aircraft."  [Jury Instructions at 5.]  At trial, two witnesses testified regarding an incident that occurred while Defendant and C.K. were boarding the flight.  Arthur Moeller testified:

> Q    . . . So what did you see this woman, the
> defendant, do during boarding?
>
> A    During boarding, while she was coming on, the
> little girl was in front of her.  She reached
> down, grabbed her arm and just yanked her straight
> up, and then pulled her towards her.
>
> Q    And what did you do in response to that?
>
> A    I told her she should be careful.  She could
> easily dislocate her arm, her shoulder.
>
> Q    And how did she respond?
>
> A    "I do it all the time, she's used to it."

[12/3/15 Tr. Trans. at 20-21.]  Charise Pleitez testified:

> A    During boarding, this lady came around the
> corner with a little girl.  And the little girl

was kind of criss-crossing in front of her. And
she had bags on her shoulders, and she was getting
agitated. And she started yelling at the little
girl. And then the next thing I saw, she grabbed
her by her right arm area, and she yanked her from
the floor to her hip.

Q    And how did you react to that?

A    I gasped outwardly.

Q    Why is that?

A    I was concerned that she could have injured
her, possibly pulled her arm out of her socket.

[Id. at 183-84.] Defendant argues that the magistrate judge
erred in allowing the Government to present testimony about the
arm-yanking incident because it was irrelevant to the charged
offense.

## IV.  Government Argument Regarding Striking

While explaining the elements of the charged offense
during closing argument, the Government argued:

The defendant here is charged with simple assault,
and the judge has instructed you that an assault
is a deliberate touching in an offensive manner
without justification or excuse. That's what you
have to find beyond a reasonable doubt.

.  .  .  .

Now let's talk about all the instances of
deliberate touching in an offensive manner without
justification or excuse . . . .

Remember during opening I told you that the
Millers didn't all see each and every single one
of these acts, but between the three of them these
are the acts that they saw the defendant do to
[C.K.]: **The defendant picked [C.K.] up and put her**

12

**down hard on her lap and on the seat next to her
over and over and over.** . . .  [Y]ou saw Brian
Miller's facial expression, you saw his hand
movements as he showed you how violently she
picked up the child and put her down over and over
and over.  Each time she did that I submit, ladies
and gentlemen, was a deliberate touching in an
offensive manner without justification or excuse.
That means each one of those was an assault.

The defendant hit [C.K.] in the face with a
stuffed doll over and over.  Mr. Miller testified
that it was a strike.  Cari Miller testified that
she slammed [C.K.] in the face with that doll.
All the Millers testified that they saw [C.K.]'s
head jerk backwards through its full range of
motion, or language to that effect.  Each time she
did that it was a deliberate touching in an
offensive manner without justification or excuse.
There is no evidence in the record that [C.K.] did
anything to justify that treatment.

          . . . .

**The defendant also pinched [C.K.]'s legs.**
She pinched them really hard. . . .  That was an
offensive touching.  That was a strike.

The defendant hit [C.K.]'s face with an open
hand, with her fingers exaggeratedly outstretched,
knocking her head backwards.  That was a strike.
The defendant pushed and shoved [C.K.]'s face,
again knocking her head backwards.  Those were
strikes.  The defendant hit [C.K.] in the back of
the head knocking her head forward, chin to chest.
That was a strike.  The defendant knocked [C.K.]
into the aisle seat next to her.  That was a
strike.  The defendant pulled [C.K.]'s arm or
clothing, pulling her to the floor.  That was a
strike.  And each one of those was a deliberate
touching in an offensive manner without
justification or excuse . . . .

Now, ladies and gentlemen, **let's turn to the
hair pulling**.  All three members of the Miller
family saw the defendant pull out [C.K.]'s

hair. . . .

[12/7/15 Tr. Trans. at 20-23 (emphases added).] During rebuttal,
the Government noted that defense counsel argued during closing
that hair pulling, pinching, and picking someone up and putting
them down roughly did not constitute striking. The Government
then told the jurors, "use your common sense. I submit to you
that all of those are striking." [Id. at 72-73.] The magistrate
judge overruled defense counsel's objection to this argument.
[Id. at 73.]

Defendant argues that the jury must have interpreted
the overruling of the objection as meaning that the law allowed
it to convict Defendant based on any offensive touching of C.K.,
including hair pulling, pinching, pushing, or jostling.
Defendant argues that this was error because Defendant was
specifically charged with assault by "striking." Defendant
therefore contends that allowing the Government to argue that she
could be convicted based on acts which did not constitute
"striking," and were therefore not charged in the Information,
violated her right to due process. Defendant also argues that
the magistrate judge compounded the error by giving the jury a
general verdict form and denying her request for a special
interrogatory that would have determined whether the jury
unanimously agreed upon the act or acts which constituted the
charged assault. See Verdict Form, filed 12/8/15 (dkt. no. 140).

14

## V. **Cumulative Effect**

Defendant's final argument is that, even if none of the previously discussed errors warrant reversal by itself, the cumulative effect of these errors, coupled with certain evidentiary rulings, warrant reversal. Defendant argues that the magistrate judge should have sustained her objections to the following hearsay testimony:

-Brian Miller's testimony that Cari Miller said Rebekah Miller told her that Defendant called C.K. "Little bitch"; [12/2/15 Tr. Trans. at 25-26;] and

-Cari Miller's testimony regarding the reaction that her eleven-year-old and her thirteen-year-old had to Defendant's actions toward C.K. – one cried and "said she felt bad," and the other did not cry but was upset [12/3/15 Tr. Trans. at 130-31].

In addition, Arthur Moeller testified that he "felt that [he] could trust" Brian Miller because he knew Miller "was an off-duty police officer." [Id. at 29-30.] Defendant argues that this was improper testimony about Brian Miller's credibility.

### STANDARD

Convictions by a magistrate judge are subject to review by a district court judge of the district in which the offense was committed. 18 U.S.C. § 3402. A district court's review of the conviction is governed by the same standards as an appeal from a judgment of a district court to the court of appeals. Fed. R. Crim. P. 58(g)(2)(D);[2] United States v. McFarland, 369 F.

---

[2] Rule 58(g)(2)(D) states: "The defendant is not entitled to a trial de novo by a district judge. The scope of the appeal is
(continued...)

Supp. 2d 54, 56-57 (D. Me. 2005); <u>United States v.
Charrington</u>, 285 F. Supp. 2d 1063, 1066 (S.D. Ohio
2003); <u>United States v. Fautanu</u>, 751 F. Supp.
1420, 1421 (D. Haw. 1990).

<u>United States v. Sledge</u>, CR. No. 06-00431 JMS, 2008 WL 1732957,

at *2 (D. Hawai`i Apr. 15, 2008).

**DISCUSSION**

## I.  **Juror Bias**

This Court reviews the magistrate judge's denial of

Defendant's request to strike Juror Number 10 for cause for an

abuse of discretion.  <u>See United States v. Mitchell</u>, 502 F.3d

931, 954-55 (9th Cir. 2007).

> [T]he Supreme Court has made clear that a court's
> failure to strike for cause a biased veniremember
> violates neither the Sixth Amendment guarantee of
> an impartial jury, <u>Ross v. Oklahoma</u>, 487 U.S. 81,
> 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988), nor the
> Fifth Amendment right to due process, <u>United
> States v. Martinez-Salazar</u>, 528 U.S. 304, 120 S.
> Ct. 774, 145 L. Ed. 2d 792 (2000), when the biased
> veniremember did not sit on the jury, even though
> the defendant must use a peremptory challenge to
> strike him.  Of the veniremembers whom Mitchell
> challenges, only #36 sat on the jury.  Mitchell
> attempts to distinguish <u>Ross</u> and <u>Martinez-Salazar</u>
> by arguing that his claim is not based on his
> compelled use of a peremptory challenge, but this
> only shows that Mitchell has asserted no injury at
> all.

<u>Id.</u> at 954-55.  Thus, where a defendant asserts that he was

forced to use a peremptory challenge to remove a juror that the

_____

[2](...continued)
the same as in an appeal to the court of appeals from a judgment
entered by a district judge."

trial court should have stricken for cause, he must "show[] that a biased juror was seated as a result of his having to use a peremptory . . . ." <u>Moore v. Horel</u>, No. CIV S-02-0007 JAM DAD P, 2010 WL 2574092, at *44 (E.D. Cal. June 24, 2010).

In the instant case, even assuming, *arguendo*, that Juror Number 10 should have been stricken for cause, Defendant is not entitled to relief unless she establishes that a biased juror – according to her Juror Number 15 – was seated because she was forced to use a peremptory challenge on Juror Number 10.  The Ninth Circuit has stated:

> Supreme Court case law in the area of juror bias is sparse.  Although we know that biased jurors may be dismissed from deliberations without offending the Constitution, we don't know precisely what it means for a juror to be biased. <u>See</u> <u>United States v. Wood</u>, 299 U.S. 123, 146, 57 S. Ct. 177, 81 L. Ed. 78 (1936) (noting that "the Constitution lays down no particular tests" for juror bias).  However, we do know that a juror is biased if he is unwilling to follow the law.  <u>See</u> <u>Wainwright v. Witt</u>, 469 U.S. 412, 423, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985) (noting that jurors lacking impartiality may be excused as biased and defining an impartial juror as one "who will conscientiously apply the law"); <u>Irvin v. Dowd</u>, 366 U.S. 717, 723, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961) (defining an "impartial juror" as one who "can lay aside his impression or opinion and render a verdict based on the evidence").

<u>Williams v. Johnson</u>, 840 F.3d 1006, 1010 (9th Cir. 2016).

> "The central inquiry in determining whether a juror should be removed for cause is whether that juror holds a particular belief or opinion that will 'prevent or substantially impair the performance of his duties as a juror in accordance

17

with his instructions and his oath.'" <u>United States v. Padilla-Mendoza</u>, 157 F.3d 730, 733 (9th Cir. 1998) (quoting <u>Wainwright v. Witt</u>, 469 U.S. 412, 433, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985)).

<u>United States v. Hayat</u>, 710 F.3d 875, 885 (9th Cir. 2013).

The assessment of juror bias is "essentially one of credibility, and therefore largely one of demeanor." <u>Patton v. Yount</u>, 467 U.S. 1025, 1038, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984). "[T]he trial court's resolution of such questions is entitled . . . to 'special deference.'" <u>Id.</u> (citing <u>Bose Corp. v. Consumers Union of U.S., Inc.</u>, 466 U.S. 485, 500, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984)).

<u>Smith v. Swarthout</u>, 742 F.3d 885, 893 (9th Cir. 2014) (alterations in <u>Smith</u>).

Defendant argues that Juror Number 15 had an implied bias against her because Juror Number 15, like Brian and Cari Miller, home schooled her children, and defense counsel asked what could be construed as negative questions about home schooling during the Millers' cross-examinations. The Ninth Circuit has stated:

we have implied bias in those extreme situations "where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances," [<u>United States v. Gonzalez</u>, 214 F.3d 1109,] 1112 [(9th Cir. 2000)] (quoting <u>Tinsley [v. Borg]</u>, 895 F.2d [520,] 527 [(9th Cir. 1990)]) (internal quotation marks omitted), or where repeated lies in voir dire imply that the juror concealed material facts in order to secure a spot on the particular jury, <u>Dyer [v. Calderon]</u>, 151 F.3d [970,] 982 [(9th Cir. 1998)]. The

18

> standard is "essentially an objective one,"
> <u>Gonzalez</u>, 214 F.3d at 1113, under which a juror
> may be presumed biased even though the juror
> himself believes or states that he can be
> impartial. <u>Dyer</u>, 151 F.3d at 982. Review is de
> novo, because implied bias is a mixed question of
> law and fact. <u>Gonzalez</u>, 214 F.3d at 1112.

<u>Fields v. Brown</u>, 503 F.3d 755, 770 (9th Cir. 2006) (en banc).

Juror Number 15 stated during jury selection that she home schooled her children for twenty-four years. [Jury Selection Trans. at 30.] She was not questioned further regarding that topic. During cross-examination by defense counsel, Cari Miller testified that she was home schooling her children. [12/3/15 Trans. at 127-28.] During a line of questioning on recross-examination regarding the point at which Cari Miller became concerned enough about Defendant's actions toward C.K. to get up and go to the back of the plane, the following exchange occurred:

> Q    You're obviously a very self-reliant person, correct?
>
> A    Yes, I'm self-reliant.
>
> Q    You teach your kids schooling, correct?
>
> A    I'm not around people who hit their children, so I'm not familiar with this type of thing.
>
> Q    So you weren't around people who swear at their kids, right?
>
> A    I've heard people swear at their kids.
>
> Q    Not like she did, correct?

19

A    No.

Q    So that was offensive to you?

A    Yes.

[Id. at 132-33.]  Brian Miller was not questioned about home

schooling.  [12/2/15 Trans. at 21-107.]  Rebekah Miller testified

that she was home schooled through high school and was a junior

in college at the time of trial.  [Id. at 135.]

There was limited testimony about the Millers' home

schooling of their children, and the subject of home schooling

was not an aspect of either the charge against Defendant or her

defense.  Even if this Court accepted Defendant's arguments that

home schooling was an aspect of the case because of Cari Miller's

and Rebekah Miller's testimony and that the defense's cross-

examination of Cari Miller could be construed as critical of home

schooling, there is no evidence in the record which would support

a finding that Juror Number 15's home school experiences resulted

in an implicit bias.  Defendant has failed to show that it was

highly unlikely that the average person in Juror Number 15's

position could remain impartial in her deliberation.   See

Gonzalez, 214 F.3d at 1112.  This Court FINDS that Defendant has

failed to establish that Juror Number 15 had an implied bias, and

CONCLUDES that Defendant has not established any constitutional

injury that occurred as a result of the denial of her request to

strike Juror Number 10 for cause.  Defendant's Appeal is DENIED

as to the juror bias issue.

## II.  **Lay Opinion Testimony**

Defendant argues that the magistrate judge allowed
Brian Miller, Cari Miller, Arthur Moeller, Charise Pleitez, and
Susan Allen to testify about whether her conduct toward C.K.
constituted parental discipline because they had some specialized
knowledge or expertise.  They were either parents or flight
attendants who had significant experience with families on
planes.  According to Defendant, the magistrate did not allow
Rebekah Miller to testify about that issue because she lacked
similar knowledge or expertise.  Defendant argues that Fed. R.
Evid. 701 prohibits lay opinions based on specialized knowledge
or expertise, and she argues that the only purpose for the lay
opinion about parental discipline was to tell the jury how to
decide the issue of Defendant's guilt.  Defendant argues that the
testimony was not helpful to the jury, and it was therefore
inadmissible lay opinion testimony.

"The admissibility of lay opinion testimony under
Rule 701 is committed to the sound discretion of the trial judge
and his decision will be overturned only if it constitutes a
clear abuse of discretion."  United States v. Lloyd, 807 F.3d
1128, 1153–54 (9th Cir. 2015) (citation and quotation marks
omitted).  Rule 701 states:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a)  rationally based on the witness's perception;
>
> (b)  helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c)  not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.[3]

---

[3] Fed. R. Evid. 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c)  the testimony is the product of reliable principles and methods; and
>
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

None of the witnesses who gave opinion testimony about whether Defendant's actions were parental discipline were qualified at trial to give expert testimony, and this Court does not address whether they could have been qualified to give expert testimony as to certain limited issues.  For example, courts have recognized that it may be possible for a law enforcement officer to give expert testimony regarding drug terms that are relevant to an investigation that he was involved in.  United States v. Gadson, 763 F.3d 1189, 1212 (9th Cir. 2014).

The Ninth Circuit has stated:

> "Rule 701(a) contains a personal knowledge requirement." United States v. Lopez, 762 F.3d 852, 864 (9th Cir. 2014). "In presenting lay opinions, the personal knowledge requirement may be met if the witness can demonstrate firsthand knowledge or observation." Id. "A lay witness's opinion testimony necessarily draws on the witness's own understanding, including a wealth of personal information, experience, and education, that cannot be placed before the jury." [United States v.] Gadson, 763 F.3d [1189,] 1208 [(9th Cir. 2014)]. But a lay opinion witness "may not testify based on speculation, rely on hearsay or interpret unambiguous, clear statements." United States v. Vera, 770 F.3d 1232, 1242 (9th Cir. 2014).

Lloyd, 807 F.3d at 1154. "[L]ay witnesses may testify about the implication of an observation when the 'observations are common enough and require such a limited amount of expertise, if any, that they can, indeed, be deemed lay witness opinion.'" United States v. Torralba-Mendia, 784 F.3d 652, 661 (9th Cir. 2015) (quoting United States v. Figueroa-Lopez, 125 F.3d 1241, 1244 (9th Cir. 1997)).

In the instant case, the parental discipline testimony was rationally based on the witnesses' respective perceptions of what he or she observed. See Rule 701(a). It is true that, in forming the opinions they gave during their testimony, Cari Miller and Brian Miller may have drawn upon their personal knowledge and experiences as parents, and the flight attendants may have drawn upon their personal knowledge and experiences

working with parents on flights. See, e.g., 12/3/15 Tr. Trans. at 75 (Cari Miller testified that her occupation was homemaker and mother); id. at 23 (Moeller testified "I've been doing this for eight years, I've seen tons of parents come on, and it's tough on a long flight."). However, that alone does not constitute "scientific, technical, or other specialized knowledge within the scope of Rule 702." See Rule 701(c). In forming their lay opinions that Defendant's actions toward C.K. were not acts of parental discipline – assuming that such opinions met all other admissibility requirements – the witnesses could rely upon their "[p]ersonal knowledge[, which] includes opinions and inferences grounded in observations and experience." United States v. Whittemore, 776 F.3d 1074, 1082 (9th Cir.) (some alterations in Whittemore) (citations and quotation marks omitted), cert. denied, 136 S. Ct. 89, 193 L. Ed. 2d 35 (2015).

The closer question is whether the parental discipline opinion testimony was "helpful to clearly understanding the witness's testimony or to determining a fact in issue." See Rule 701(b). The jury was instructed that:

> In order to find that the government has met its burden of proof in this regard, you must agree unanimously on at least one particular act of striking which the defendant committed, as well as the other elements of the crime charged. The government must also prove that the act of striking committed by the defendant was not permissible parental discipline.

24

The evidence has raised an issue of whether the defendant used force or physical punishment as permissible parental discipline at the time of the alleged acts on her child in relation the [sic] crime charged in this case which is simple assault.

In determining this issue you must consider all of the relevant facts and circumstances including, but not limited to, the amount of force used, the age and size of the child, the misconduct of the child, the instrument used, if any, the number of times and manner the instrument was used, and the injuries inflicted.

A parent does not ordinarily commit a criminal offense by inflicting physical punishment upon a child subject to his or her parental authority because such parental authority includes the right to discipline a child. However, that right is not absolute.

The force or physical punishment must be for the purpose of safeguarding or promoting the welfare of the child, including the prevention or punishment of the child's misconduct, and the force or physical punishment used may not be unreasonable or excessive.

Unreasonable or excessive force is that designed to cause or known to cause a substantial risk of causing death, serious bodily injury, disfigurement, extreme pain, extreme mental distress or neurological damage.

[Jury Instructions, filed 12/7/15 (dkt. no. 138), at 6-7.] Thus, the issue of whether Defendant's actions toward C.K. were within Defendant's parental authority to discipline her child was one of the ultimate issues for the jury to decide. That alone, however, did not render lay opinion testimony about whether Defendant's actions constituted parental discipline inadmissible.

> "Lay opinion testimony is not inadmissible
> solely because it addresses the ultimate issue in
> the case." 4-701 Weinstein's Federal Evidence
> § 701.05 (collecting cases); <u>United States v.
> Crawford</u>, 239 F.3d 1086, 1090 (9th Cir. 2001) ("A
> lay witness may testify as to an ultimate issue of
> fact, so long as the testimony is otherwise
> admissible. The lay witness may not, however,
> testify as to a legal conclusion, such as the
> correct interpretation of a contract.") (citation
> omitted). "Courts may properly be wary, however,
> of admitting lay opinion testimony when its sole
> function is to answer the same question that the
> trier of fact is to consider in its deliberations.
> Such testimony may be excluded as unhelpful." 4-
> 701 Weinstein's Federal Evidence § 701.05
> (collecting cases).

<u>United States v. Christensen</u>, CR-14-8164-PCT-DGC(MHB), 2016 WL

1158893, at *2 (D. Ariz. Mar. 24, 2016).

In the instant case, the issue of whether Defendant's

actions toward C.K. constituted parental discipline was more than

a question of opinion about parenting philosophies, it was a

legal defense. <u>See, e.g.</u>, <u>United States v. Staton</u>, 68 M.J. 569,

573 (A.F. Ct. Crim. App. 2009) (discussing parental discipline

defense), *aff'd*, 69 M.J. 228 (C.A.A.F. 2010). Further, it was

unnecessary for each witness to opine about whether Defendant's

actions constituted parental discipline in order to describe what

he or she observed. They could have described their observations

of Defendant's actions, the force Defendant used, how Defendant's

actions affected C.K., and whether any of C.K.'s behavior

prompted Defendant's actions, without opining on the legal

question of whether Defendant's actions were within the authority

of parental discipline.  For example, Brian Miller testified:

A    Well, at one point, she – early on, when I was watching her, she had a stuffed animal, a big stuffed animal.  And she had the child facing her, and she kind of hit the child in the face with the stuffed animal.  When she did that, the kid's head snapped back in its full range of motion.

Q    How forcefully did she hit the child with that stuffed animal?

A    Well, it wasn't like a punch, but it was more than a push, so it was kind of a rapid – kind of a shove into her face.

Q    Did she strike her with that stuffed animal?

A    Yeah, I would say that was a strike, yes.

Q    And how did the child react?  How did the child's body react when being struck?

A    Her head went back, and she didn't fall backwards.  I'm not sure, but I think maybe she was kind of holding on to the kid.  But the child's head snapped all the way back, like I said, its full range of motion is what it appeared to me.

Q    And for the record, let the record reflect the witness has demonstrated by moving his own head, how the child's head moved.

Can you show the jury with your own arm movements how forcefully and rapidly the woman was striking the child with the stuffed animal?

A    I saw her strike the child once with the stuffed animal in the front of her face, and it was about like that.

. . . .

A    . . . I felt like that could have hurt the little kid.

Q    In what way?

A    I mean, a neck injury or something like that.

Q    What, if anything, was the child doing that you saw to prompt that sort of behavior by the woman?

A    I didn't see anything the child was going to prompt that kind of behavior.

Q    How was the child behaving generally?

A    Well, during the ten minutes that I watched her, I mean, she seemed kind of antsy, like a little kid is on a long flight, like she didn't really want to sit down and stuff.  She wasn't screaming or hitting or flailing or anything like that, but she was kind of antsy, kind of moving around.

[Id. at 29-31.]  Brian Miller subsequently opined that Defendant did not appear to be disciplining her child.  [Id. at 38.]  This Court FINDS that his opinion was not necessary for the jury to understand his testimony about what he observed.  For the same reasons, this Court also FINDS that Cari Miller's, Arthur Moeller's, Charise Pleitez's, and Susan Allen's opinion testimony about whether Defendant's actions constituted parental discipline was not necessary for the jury to understand their respective descriptions of what they observed.  The only purpose that these witnesses' opinion testimony served was to answer the same questions that the jury was to decide during deliberations.  This Court therefore CONCLUDES that the lay opinion testimony about parental discipline was not helpful to the jury, and

therefore the testimony was inadmissible under Rule 702.

This Court CONCLUDES that: the magistrate judge abused his discretion by allowing the Government to present lay opinion testimony regarding whether Defendant's actions were within the authority of parental discipline; and, under the facts of this case, the error was not harmless. This Court therefore GRANTS Defendant's Appeal as to the lay opinion testimony issue, REVERSES the Judgment, and REMANDS the case to the magistrate judge for a new trial.

## III. **Remaining Issues**

In light of this Court's ruling on the lay opinion testimony issue, it is not necessary for this Court to address the remaining issues in the Appeal. However, this Court will address the remaining issues – with the exception of the cumulative error issue – to provide guidance on remand.

### A. **Pre-Flight Incident**

The Government does not dispute that the incident during which Defendant yanked C.K.'s arm and pulled C.K. toward her could not be an act of striking for purposes of the charged offense because it occurred during boarding. The Government argues that Arthur Moeller's and Charise Pleitez's testimony about the incident was still relevant because it: explained why the flight attendants took notice of Defendant early in the flight; was inextricably intertwined with the Defendant's actions

during the flight; and provided necessary context for Defendant's actions during the flight. Defendant argues that evidence of the arm-yanking incident was irrelevant, pursuant to Fed. R. Evid. 402 and 404(b).

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Rule 402 states, in pertinent part, that "[i]rrelevant evidence is not admissible" and "[r]elevant evidence is admissible," unless otherwise prohibited by another rule of evidence. Rule 404(b) states:

Crimes, Wrongs, or Other Acts.

(1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses; Notice in a Criminal Case. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:

(A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and

(B) do so before trial – or during trial if the court, for good cause, excuses lack of pretrial notice.

The Ninth Circuit has stated that:

> Trial judges have "wide discretion" in determining
> whether evidence is relevant.  United States v.
> Long, 706 F.2d 1044, 1054 (9th Cir. 1983).
> Evidentiary decisions are therefore reviewed for
> abuse of discretion.  United States v. Rohrer, 708
> F.2d 429, 432 (9th Cir. 1983).  In making this
> determination, reviewing courts consider whether
> the decision was based on relevant factors and
> whether there was "a clear error of judgment."
> United States v. Soulard, 730 F.2d 1292, 1296 (9th
> Cir. 1984).  Reversal is required if it is "more
> probable than not" that the error affected the
> verdict.  Rohrer, 708 F.2d at 432.

United States v. Alvarez, 358 F.3d 1194, 1205 (9th Cir. 2004).

Arthur Moeller testified that, based on the arm-yanking

incident, he

> had the D flight attendant[4] stay up front,
> because I have a certain area of responsibility,
> which means I can't really go past row 4 on that
> case.  And if I do, I need to make sure she stays
> up front.  So I had her stay up front.  I went
> towards the back of the aircraft, just to take a
> peek, make sure everything was okay, and just get
> a feel for the situation.
>
> Q    And what do you mean by "take a peek"?
>
> A    I went down just to look at her, make sure
> that again safety is the biggest thing, so make
> sure she is not intoxicated, make sure that – if
> she is going to be a safety issue on the aircraft,
> things such as that.

[12/3/15 Tr. Trans. at 22.]  The Government is correct that the

---

[4] Charise Pleitez testified that she was the D flight
attendant, who acts as a roving attendant through all sections of
the airplane.  [12/3/15 Tr. Trans. at 190.]  Arthur Moeller was
the A flight attendant, who is "pretty much the flight attendant
in charge."  [Id. at 16.]

arm-yanking incident explained why Arthur Moeller took note of

Defendant early in the flight and asked Charise Pleitez to stay

in a certain area of the plane.  However, the fact that he took

note of Defendant is not "of consequence in determining the

action," see Rule 401(c), because there was no dispute either

during the flight or at trial regarding the identity of the woman

who committed the alleged assault.  This Court therefore rejects

that portion of the Government's relevancy argument.

If Arthur Moeller's and Charise Pleitez's testimony

about the arm-yanking incident was inextricably intertwined with

Defendant's actions during the flight and/or was necessary to

provide context for their testimony about Defendant's actions

during the flight, their testimony would arguably be relevant

under Rule 401.  In addition, the Ninth Circuit has stated:

> Generally, evidence of other acts need not
> meet the requirements of Rule 404(b) when it is
> inextricably intertwined with the evidence
> concerning the crime with which the defendant is
> charged.  United States v. Matthews, 240 F.3d 806,
> 817 (9th Cir. 2001).[5]  Evidence of other acts is
> inextricably intertwined when (1) it constitutes a
> part of the transaction that serves as the basis
> for the criminal charge, or (2) it helps the
> prosecutor "offer a coherent and comprehensible
> story regarding the commission of the crime."
> United States v. Vizcarra-Martinez, 66 F.3d 1006,
> 1012-13 (9th Cir. 1995).

---

[5] United States v. Matthews, 240 F.3d 806, 817 (9th Cir.
2001), was overruled on other grounds on rehearing en banc.  278
F.3d 880 (9th Cir. 2002).

United States v. Bates, 147 F. App'x 693, 695 (9th Cir. 2005).

Arthur Moeller testified that Brian Miller approached him about Defendant's actions toward C.K., but Arthur Moeller acknowledged that he did not personally observe anything that Brian Miller told him about. [12/3/15 Tr. Trans. at 26, 35.] Thus, Arthur Moeller did not see any in-flight incidents that could form the basis of Defendant's conviction. Charise Pleitez testified that: she thought Defendant was, in general, "kind of rough with" C.K.; Defendant made a strange statement to her about C.K.; Defendant got "very agitated" with C.K. while Defendant was filling out the agriculture form; the play that Defendant engaged C.K. in "didn't seem natural"; and she did not see anything else of significance transpire between Defendant and C.K. [Id. at 186-87.] In other words, like Arthur Moeller, Charise Pleitez did not observe any of Defendant's specific, in-flight, actions toward C.K. that could have formed the basis of Defendant's conviction. Because neither Arthur Moeller nor Charise Pleitez observed any of the in-flight actions that could form the basis of Defendant's conviction, this Court rejects both the Government's argument that their testimony about the arm-yanking incident was inextricably intertwined with the in-flight incidents and the Government's argument that their testimony provided necessary context for the in-flight incidents.

33

This Court therefore concludes that the testimony about the arm-yanking incident was irrelevant. However, because the arm-yanking incident was similar in nature to the in-flight incidents, this Court cannot conclude that the testimony about the arm-yanking incident was so prejudicial that it is more probable than not that its admission affected the verdict. See United States v. Alvarez, 358 F.3d 1194, 1205 (9th Cir. 2004) ("Reversal [based on the admission of irrelevant evidence] is required if it is more probable than not that the error affected the verdict." (citation and internal quotation marks omitted)). This Court rejects Defendant's argument that the admission of testimony regarding the arm-yanking incident was reversible error. The Appeal is DENIED as to the issue regarding the pre-flight, arm-yanking incident.

**B.   Government Argument Regarding Striking**

The Information charged Defendant with "being an individual on an aircraft within the special aircraft jurisdiction of the United States" who "did intentionally and knowingly assault 'C.K.' . . . by striking her repeatedly."  The magistrate judge instructed the jury that the elements of the offense were:

> 1.    While on an Alaska Airlines plane, after the moment all external doors were closed following boarding, but before the moment when one external door was opened to allow passengers to leave the aircraft;

2.    The defendant assaulted C.K. by
intentionally striking her; and

3.    When the defendant did so, C.K. was
under the age of 16 years.

"Assault" means a deliberate touching of
another in an offensive manner without
justification or excuse.

The government has charged the defendant with
committing simple assault by repeatedly striking
her child.

The government is not required to prove that
the defendant committed every one of the acts of
striking alleged in the charge.  However, the
government is required to prove that the defendant
committed at least one of them.

In order to find that the government has met
its burden of proof in this regard, you must agree
unanimously, on at least one particular act of
striking which the defendant committed as well as
the other elements of the crime charged.  The
government must also prove that the act of
striking committed by the defendant was not
permissible parental discipline.

[12/7/15 Tr. Trans. at 8-9.]  Thus, the Government was required

to prove that Defendant committed assault by striking, not just

that she committed "simple assault."  Defendant argues that the

Government improperly argued during closing argument and rebuttal

that the jury could find her guilty if it found that she

committed any offensive touching – *i.e.* any assault – even if it

was not a "striking."  Defendant argues that, because the

magistrate judge overruled defense counsel's objections to this

type of argument, the jury could have interpreted the rulings to

35

mean that the Government's argument was a correct statement of the law.

This Court concludes that the magistrate judge correctly instructed the jury on the elements of the charged offense, including the definition of the term "assault" and the requirement that the Government prove that Defendant assaulted her child by intentionally striking her. See Jury Instructions at 5-6. To the extent that Defendant contends the Government's argument was a misstatement of the law, defense counsel had the opportunity to point that out during the defense's closing argument because at least one of the instances when the Government made the allegedly improper argument was during its closing argument. Further, as to Defendant's argument regarding the magistrate judge's overruling of the defense's objections, the magistrate judge expressly instructed the jury that, except for his instructions on the law, it was to disregard anything he said during the trial. See id. at 11. It is well settled that "[a] jury is presumed to follow its instructions." Weeks v. Angelone, 528 U.S. 225, 234 (2000).

This Court therefore rejects Defendant's argument that, based on the Government's allegedly improper closing and rebuttal argument, and the magistrate judge's overruling of defense counsel's objections, the jury may have convicted her based on acts that did not fall within the scope of the charged offense.

The Appeal is DENIED as to the issue regarding the Government's argument about striking.

###    C.    **Cumulative Error**

Insofar as this Court's analysis of the remaining issues is included in this Order merely to provide guidance on remand, this Court declines to address the merits of the cumulative error issue.  The Appeal is DENIED as MOOT as to that issue.

**CONCLUSION**

On the basis of the foregoing, this Court GRANTS Defendant's Appeal as to the lay opinion testimony issue, and DENIES the Appeal in all other respects.  This Court therefore REVERSES the Judgment and REMANDS the case to the magistrate judge for a new trial.  This Order shall take effect on **April 10, 2017**, unless a motion for reconsideration of this Order is filed by **April 5, 2017**.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, March 20, 2017.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**USA VS. SAMANTHA LEIALOHA WATANABE; CR 15-00326 LEK; ORDER GRANTING IN PART AND DENYING I PART DEFENDANT'S APPEAL, REVERSING JUDGMENT IN A CRIMINAL CASE AND REMANDING CASE TO THE MAGISTRATE JUDGE FOR A NEW TRIAL**